**NATIONAL LABOR RELATIONS BOARD
v. BLOSSOM PRODUCTS CORPORA-
TION.**
No. 7702.

Circuit Court of Appeals, Third Circuit.
June 17, 1941.

Gerhard VanArkel, of Washington, D. C., for petitioner.

Bernard Frank, of Allentown, Pa., for respondent.

Before CLARK, JONES, and GOOD-RICH, Circuit Judges.

GOODRICH, Circuit Judge.

This is a petition by the National Labor Relations Board for the enforcement of an

order issued by it against respondent pursuant to Section 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c). Respondent is a Pennsylvania corporation with its sole office and place of business at Allentown, Pennsylvania. No question of jurisdiction is presented. The important element in the case is the alleged violation of Section 8(1) and (2), 29 U.S.C.A. § 158 (1, 2), by employer interference with and domination of the formation and administration of a local union called "Blossom Workers Organization". No new question of law arises on this phase of the case. Indeed the fact pattern is one closely similar to that met in many others. The sole question before the court upon petition to enforce is whether there is substantial evidence to support the findings of the Board.

The factual history relevant to the question begins in the fall of 1937. At that time organizers for the International Ladies' Garment Workers Union (I.L.G.W. U.) undertook to organize respondent's employees. By September 20 this campaign had proceeded far enough to hold a first organizational meeting. The following day the superintendent of the plant proposed to an employee named Breisch that a committee be chosen to present demands to the employer to "see if we couldn't straighten this thing out before we took steps to get an outside union". As a result of discussion with other employees it was decided to suspend further union activity until the committee talked with the president of the company, Mr. Lesavoy. A conference was held that day in which Mr. Lesavoy granted certain wage revisions and another conference was held three days later. On the same day, following a consultation between Mr. Lesavoy and his lawyer, Mr. Getz, the company distributed to each employee a mimeographed circular. The iniquity of this circular is stressed in the Board's argument.[1] The circular is in evidence as one of the company's exhibits and its admission was objected to by counsel of the Board at the hearing as a "self serving statement". We do not find in the language used in the circular a violation of the Act. We do think it is relevant evidence, in connection with other facts, upon the question of domination by the company of the inside labor organization. There had been no movement for such organization prior to the beginning of solicitation by the I.L.G. W.U. The circular standing alone certainly does not show the parentage of an inside organization by the company, but it does not stand alone.

There was a finding by the Board that at one or both of the conferences at which employees and the company's president and counsel were present, that there was openly proposed the formation of an inside union and that there was disparaging talk concerning outside unions. This con-

---

[1] The circular reads:
"To All Employees
"We wish to inform you that this company will not in any way interfere with the rights you have as an employee of this company.
"The recent Wagner Act signed by our great President, F. D. Roosevelt, gives you Employees the following right:
"1. To be free from joining any union whatsoever.
"2. To organize your own independent union, free of any interference by us or any other organization.
"3. To organize or affiliate yourselves with the recognized industrial unions such as the C.I.O. and A.F. of L.
"4. This company stands ready to protect every employee who chooses his right under the law not to join a union.
"This company will not be considered unionized until a recognized industrial union is able to obtain a majority membership of our employees. This majority membership must be determined and approved by the National Labor Relations Board, which has been set up by the U. S. Government to help employees.
"We want you to understand that at all times, this company is doing everything in its power to not only respect the rights of the employees, but to also better their conditions.
"We want to assure you we will at no time permit any union to force us to discharge employees who have not joined a union.
"The State of Pennsylvania has recently passed a labor law whereby the employees of the State are protected in regards to working hours. Under this law beginning December 1st, 1937, the maximum hours of 44 hours will apply to all employees.
"A copy of the Wagner Act describing your rights will be issued to you as soon as they are obtained from Washington.
"Signed by,
"Larry Lesavoy,
"President.
"Blossom Products Corporation."

sisted of declarations to the effect that membership in such unions was composed of "bums and loafers" and that the money paid "only goes to big shots" who "have big cars". There was also found an intimation that employees might be thrown out of work if their mill was organized by the C.I.O. as that had been the situation at other local mills. All these findings, quite naturally, came out of a conflict of testimony. And we repeat, what has been said in so many other decisions in these cases, that the finding of facts from conflicting testimony is not for us.

The organization of employees into a local union moved on apace. Three meetings of the employees were held between October 1 and November 4, 1937 to organize the Blossom Workers Organization (B.W.O.). An employee, named Moyer, in each instance shut off the power in the plant, with or without help. Operation of the power switches was not in the line of her duty. No question was made of this unusual act on her part. All employees were paid for the time thus taken from work.

Shortly after the third meeting the president of the company hurriedly returned from Philadelphia in response to a telephone call which told him that the lawyer for the B.W.O. wanted to see him. At a meeting in the lawyer's office he promptly recognized B.W.O. as the representative of the employees and agreed to check off B.W.O. dues. No evidence was found of a bona fide offer to verify B.W.O.'s claim of majority status. Slips authorizing deduction of dues for B.W.O., prepared and furnished by management, were circulated and signed by employees during working hours.

The organization thus set up held some social functions. It never inquired into the general wage condition in the plant. It never discussed with management the rather drastic reduction in personnel which occurred late in 1937. A subsequent general raise was attributed neither by management nor B.W.O. to any activity of that body.

■ Bearing in mind always that conflicts in testimony are resolved by the Board and not ourselves we conclude that there is ample evidence to justify the finding that B.W.O. owed both parentage and nurture to management and that it has been a docile child which never got out of hand. Violation of Section 8(1) and (2) are clearly supported.

### The Order.

■ The cease and desist provisions of the order[2] will be enforced. With re-

---

[2] The order directs the respondent as follows:

"1. Cease and desist from:

"(a) In any manner dominating or interfering with the administration of Blossom Workers' Organization or with the formation or administration of any other labor organization of its employees, and from contributing support to Blossom Workers' Organization or to any other labor organization of its employees;

"(b) Giving effect to its agreement with Blossom Workers' Organization or to any extension or renewal thereof, or to any successor agreement with Blossom Workers' Organization which may now be in effect;

"(c) In any other manner interfering with, restraining, or coercing its employees in the exercise of the rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Withdraw all recognition from Blossom Workers' Organization as a representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, rates of pay, wages, hours of employment, or other conditions of employment, and completely disestablish Blossom Workers' Organization as such representative;

"(b) Reimburse each of its employees whose dues to Blossom Workers' Organization were checked off, for the amounts thus deducted from their wages since November 15, 1937;

"(c) Post notices immediately in conspicuous places in its plant and maintain such notices for a period of at least sixty (60) consecutive days, stating that the respondent will cease and desist in the manner set forth in 1 (a), (b), and (c) and that it will take the affirmative action set forth in 2 (a) and (b) of this Order, and that the respondent's employees are free to remain or become

gard to the affirmative action, the notices to be posted should be changed in the manner discussed in Oughton v. National Labor Relations Board, 3 Cir. 1941, 118 F. 2d 486, 499, so that the company agrees not to engage in the conduct prohibited, rather than confess by the "cease and desist" phraseology, that it has offended. In addition, the notice that the employees are free to remain or become members of the I.L.G.W.U. should have added to it the clause we inserted in Roebling Employees Association, Inc., v. National Labor Relations Board, 3 Cir., 1941, 120 F.2d 289, namely: "but the employees are free to organize or join any union they choose, whether or not it is affiliated with a national union".

The Board's order also directs the respondent to reimburse each of its employees whose dues to B.W.O. were checked off for the amounts thus deducted from their wages since November 15, 1937. The power of the Board to make such an order is contested by the respondent. Argument grows out of Republic Steel Corp. v. National Labor Relations Board, 1940, 311 U. S. 7, 61 S.Ct. 77, 85 L.Ed. 6. The only authority in support of the Board's position is a dissenting opinion by the late Judge Arant in National Labor Relations Board v. West Kentucky Coal Co., 6 Cir., 1940, 116 F.2d 816. The problem has been fully and adequately discussed in the Seventh Circuit in National Labor Relations Board v. J. Greenebaum Tanning Co., 1940, 110 F.2d 984, and in the Second Circuit in Western Union Telegraph Co. v. National Labor Relations Board, 1940, 113 F.2d 992. Accord: Kansas City Power & Light Co. v. National Labor Relations Board, 8 Cir., 1940, 111 F.2d 340, and A. E. Staley Mfg. Co. v. National Labor Relations Board, 7 Cir., 1940, 117 F.2d 868. Counsel for the Board informs the court that this question is presently pending before the Supreme Court in Virginia Electric & Power Co. v. National Labor Relations Board in which certiorari has been granted.[3] The request is made that the decision on this point be withheld pending the Supreme Court's decision. An analogy is found in National Labor Relations Board

v. Ford Motor Co., 6 Cir., 1940, 114 F.2d 905, 915. This will be done.

As thus modified the order will be enforced. A decree may be submitted accordingly.

members of the International Ladies' Garment Workers Union or any other organization;

"(d) Notify the Regional Director for the Fourth Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith."

[3] Reported in 4 Cir., 1940, 115 F.2d 414, certiorari granted 61 S.Ct. 826, 85 L.Ed. ——.